on appeal from the Court of Federal Claims. Ms. Hoard, you want four minutes for rebuttal? Yes, Your Honor. All right. You may begin. May it please the Court. We've asked the Court to review the claims court's erroneous interpretation of an alternative fuel mixture tax credit that was in effect for the tax year ending 2011 under Section 6426E2A. For a producer like ACR, the credit was available if they sold the fuel mixtures for use as a fuel. Unless the Court prefers otherwise, I'd like to address the sale element first. Well, Annette, just to confirm, if there is no sale, that's the end of the inquiry, right? Yes, Your Honor. Okay. So probably you should address that first. Yes, Your Honor. I think the parties agree that the definition of sale contained in the fuel excise tax provisions is the definition that governs in the transaction. And that definition has two components. There must be a transfer of title to the goods in exchange for consideration. Here, ACR transferred the fuel mixtures to the anaerobic digester companies. And in exchange, the anaerobic digester companies paid for the fuel, but they also provided the additional consideration of assuming the liability of disposing of the byproducts. How much did they pay? What was the sale price? The sale price included a small purchase price. What was that purchase price? It depended on the contract. For the wastewater treatment plant in Des Moines, I believe it was $950 annually. For the Amana farms, it was $1,000. And what do you say the value of the goods transferred were? The value of the goods transferred to the digester companies is not quantified in the record. However, what I think the claims court has overlooked is that the fuel mixtures did provide a benefit to the buyer. I just want to understand in terms of the sale price. Am I understanding the record right that the anaerobic digester companies gave you $10,000 approximately for an exchange of something like 10 or 11 million barrels of this stuff? It depended on, I think there were close to 40 million barrels all total. Wait, 40 million gallons all total of the fuel. 40 million gallons of this corn stillage, right? Yes, Your Honor. And then, I don't know. I don't know what that breaks down to per gallon, but maybe it's far less than a penny per gallon of this stuff. But the other form of consideration, Your Honor, and I think this is what's been left out of the discussion. The other form of consideration is the digester companies could use part of the byproducts of the corn stillage. They could use the methane, and they did use the methane, and the methane increased production of the fuel products increased the methane production, and they were able to use the methane then to create electricity. The other thing that they did for the companies was they disposed of the final byproduct. It was one of the byproducts they couldn't use, and they had the obligation to dispose of those byproducts. And this court said in Coltec that if the purchaser assumes the liability, assumes contingent liabilities, and there are liabilities associated with disposal of these byproducts, that constitutes part of the purchase price. Even if you meet the technical definition of there being some kind of consideration for the transfer of the goods, don't we have to assess whether or not the economic substance of that is truly a sale? First of all, we don't believe the economic substance doctrine applies to this type of tax credit. Well, this is an incentive tax credit like the tax credit in the Ninth Circuit opinion of Sachs, which this court cited in Salem Financial. In Salem Financial, the court noted that we don't expect companies like this to make a profit when they're dealing with nascent technologies. So first of all, if you look at the footnote to the House budget report contained within the 2010 legislation on economic substance, it makes clear that they don't intend for the new codified economic substance doctrine to apply to a transaction like this. So whenever it's a tax credit, then economic substance never applies? No, Your Honor. I think economic substance would apply to a foreign tax credit that's offsetting a tax. But this is an incentive tax credit involving alternative fuels. Congress was trying to incentivize innovators in taking waste products and figuring out how to use those waste products as a renewable energy source to create new fuel resources. So here, we don't think the economic substance doctrine applies, and this court in Salem Financial agreed, when you have a nascent technology such as a tax credit. Your Honor, we have to have a sale involved. Yes, Your Honor. We have to have a sale. And I'll invite you to look at Appendix 861. It's one of the exhibits that is in the record, and it's an email from Larry Hare to Royce Hammett. Just tell us real quickly who those two individuals are. Well, I know Mr. Hare was the operations manager, and who did you say the email was to, Your Honor? Well, look at the exhibit. It's on 861, Appendix 861. Oh, to Royce Hammett. They both worked for the Des Moines Wastewater Treatment Plant. The customer. The customer, yes, Your Honor. And look at what they say. This is for the tax credit stuff. A once-a-year charge of $950 for us to, quote, buy the qualified buy product, the feedstock. Then we turn around and charge them $950 for the administration fees, so it's a wash. Is that a sale? Your Honor, that was not the entire consideration for the sale, and this court said in Coltec you have to look. Let's say, just looking at this right now, what they're saying. Yes, Your Honor. Okay, because he does refer to this as buying, that we're buying. Yes. So this is in the context of a sale. Is this a sale under the statute where one party gives $950 to another one, and the other one just simply returns the money to them? If you exclude the contingent liabilities, then yes, I would argue it's still a sale under the only case that's dealt with the sale of a fuel tax. The excise tax is a case called Bass Station. And while I realize it's not present. Under basic contract law, is that consideration? You have to look at all the forms of consideration, Your Honor. And, in fact, in the Supreme Court case of Frank Lyon. Just looking at the $950 exchange here, is that consideration? Is that a sale? Well, if you're only giving that as example, perhaps someone could argue it's not a sale. However, I'd like to point out the Bass Station case because it's instructive on how the government generally views a sale under the fuel excise tax regulations. If you look at Bass Station, there was no profit involved in that transaction whatsoever. What happened in Bass Station was that Bass Station purchased the entire shipment of fuel from Texaco. And Transport Petroleum transported, provided services to them of transporting the fuel. Transport Petroleum couldn't meet the minimum purchase requirements to buy fuel from Texaco. So what would happen is, in exchange for performing those services and paying for the gas that they got, where there was no profit. They just paid at cost the gas they got. The Ninth Circuit said, yeah, that was a sale. Well, first of all, A, it's Ninth Circuit. B, it is non-prec. But putting even all that aside, there was actually money moving around because you're not talking about a transfer from A to C. You're talking about a transfer from B to C where B is an agent of A, right? Yes, Your Honor. Right. So there was actual transfers of cash, right? Yes, Your Honor. But if you look at the regulation, and I don't mean to interrupt, but if you look at the regulation, the regulation says money, services, or other things. And here we have services. Well, the services were flowing to you. That's right, Your Honor. We provided title to the goods. We had title to the alternative fuel mixture. But then you paid for those services. Did you or did you not? We paid a tipping fee, which is standard in the industry at that time. 1.7 million tip? Yes, Your Honor. Okay. Yes, Your Honor. So that's a lot more than $9,000 going the other way, right? Yes, Your Honor. But still, there was a disposal obligation at the end of the processing that had to be complied with. And what I want to do is step back a little bit and look at the economic substance cases and Frank Lyon, the Supreme Court case. All of those cases say you have to look at the market realities in existence at the time. Well, isn't that what the Court of Federal Claims did? No, Your Honor. We don't think they did because there were only 800 digesters in the United States that were producing their own energy out of 3,450 digesters in the United States. So there wasn't a market for this fuel. The tax credit was to incentivize people to learn how to do this because sometimes people get stuck in a rut and they go, oh, we've never done that before, we don't want to think about it. This tax credit incentivized these individuals to go out and try to sell these alternative fuels to the anaerobic digesters because they were creating methane. They could create methane that could then produce electricity and then if they produced enough electricity, they could sell that electricity to local power companies. I've had clients who've done that in the past. So this was an industry that Congress was trying to spur with this tax incentive. Even if you think the economic substance doctrine applies, this transaction had economic substance. This wasn't a paper transaction. It wasn't a structured transaction in an accounting firm or a law firm with a bunch of paper that generated a high basis and then a loss. They went out and they incurred economic risks in pursuing this. In pursuing this, they had to pay for transport, they had to pay for insurance to cover any liability. In the record, they had to deal with problems that their fuels probably caused. You're in your rebuttal but I have another question before you sit down. What was the expectation of pre-tax profit here? The pre-tax profit, the tax credit serves the purpose of pre-tax profit. But what we also do under the economic substance doctrine… It says there has to be an expectation of pre-tax profit. No, Your Honor. We said it doesn't have to be substantial profit, but under the economic substance doctrine as codified, there must be some expectation of pre-tax profit. There was, but what they had to do is once they got the digester company creating excess methane, what our clients were trying to do was we were going to go to the facilities and establish stations that could clean the methane, compress the methane, and convert the methane into compressed natural gas. That's speculative. That's speculative. That's not the expectation of the pre-tax profit. But, Your Honor, that's what industries are doing now is they're using compressed natural gas to fuel municipal vehicles. How would you have title to the resulting methane? You transferred all title to the underlying corn stillage waste. Well, the goal would be to create the facilities that help the digester companies clean and compress the methane. So would you buy back the methane from them? No, they would pay for the services of processing and compressing the methane. But you never even had any of that up and running. No, it wasn't up and running yet, but the parties, even after the credit expired in 2011, the parties were still negotiating through 2013 to set up the facilities to clean. Okay. You've got two minutes left. Why don't you say it? Thank you. Okay. You would agree that there was at least, you know, on its face some consideration, right? Whether it was meaningful consideration or not is really the question. No. No, I wouldn't agree with that. So we would agree that some of the digester operators gave them some money. It was $8,950 total for the 40 million gallons of mixtures. But that wasn't consideration for anything. It was window dressing for tax credits to try to give it the appearance of a sale. The economic reality of these exchanges was that ACR did not transfer its mixtures to the operators for a price. It paid a price to the operators. It paid them $1.7 million in order to get them to take those mixtures off their hands. The reality is that ACR was not selling mixtures. It was buying disposal services. But what was the $8,000 for? The $8,000 was that window dressing was to sort of make it look like sales, just like in the email that was discussed that this is for ACR's tax credit stuff. But that email was talking about a $950 administrative fee that was then offset. But what about the $8,000? Oh, so the remaining $8,000, I think it doesn't change the economic reality that ACR was paying them to take the mixtures instead of receiving a price from the operators. It reduced the $1.7 million that they paid out. Well, they got $8,000 of that back. But the economic reality is that they were paying the operators to take these mixtures. My friend on the other side talked about the Basque Station. But what was dispositive there was that the transfer, it wasn't a gratuitous transfer. It was that the other person paid something. It didn't matter that they sold it to them at cost, but the other person paid something. They weren't just giving it away. But in this case, ACR couldn't, they couldn't give away their mixtures. No one would even take them for free. They had to pay $1.7 million in order to get these people to take them off their hands. So that's not a sale. Does the economic substance doctrine turn on the intent of the taxpayer? Well, it turns in part on whether there was a non-tax purpose. And so the taxpayer's purpose, their subjective intent, I guess to the extent, by intent we're talking about purpose. But we don't have findings on subjective intent, do we, from the Court of Federal Claims? I thought it was more about just looking at the objective economic realities of this transaction. Yeah, yeah, I think that's right. And therefore, you know, with $1.7 million going one way and $8,000 going the other way, it makes the $8,000 look like the tiniest of fig leaves. Yeah, that's exactly right. I mean, it's a 200% difference. So if Congress's purpose in credits like this is to incentivize innocent technologies, I mean, Congress would recognize that those companies wouldn't be profitable or certainly wouldn't be profitable for some period of time. Yeah, that's right, that's right. And it's not our position that they had to make a profit on the sales of this. But Congress did put limits on the credit, and one of the limits it put was that you actually have to sell the mixture. And what these transactions, they're not sales. There was no transfer of property in exchange for a price. There was a receipt of services in exchange for a price. Can you address the issue of, under the regulation, the requirement that is used as a fuel, that requirement? It seems to me that the government requires here the appellant to prove something that they cannot prove. And at a certain time, these goods become fungible, correct? At a certain time, I'm sorry, what becomes fungible? At a certain time, these elements become fungible. I mean, once you start the digesting process, you can't tell the difference of whether this percentage belongs to ACR or that percentage belongs to somebody else. Yeah, that's right. I'm thinking as an example, a grain silo. You have farmers that come in and dump off grain. Well, the silo understands that Farmer Joe has 25% of the grain here, is Farmer Joe's. Farmer Joe doesn't have to show that that grain has been sold or that that particular grain has been sold. All they have to show is that you sold off grain at a certain price, 25% of that belongs to me. Why shouldn't something like that work here? Well, because here, in this situation, they're not relieved of their duty to substantiate their claims,  but it's that the sale was for use as fuel. And so what we talked about on substantiation is that, partly because those mixtures are all put together, and you're right, it is, in the way that at least the WRA did their operations, it would be impossible to know how much of their product was actually resulted in it. Oh, well, our position isn't that it never did. Our position is that they can't substantiate the amount that was. And that's their burden. They have the burden of proof on all of the issues. But does that prong require substantiating the amount rather than just the fact that it was sold for purposes of use as a fuel? Well, yes, we would say that it does, because the credit is based on the amount. And so they put in 40 gallons of substance, but we don't know how much, if any, actual electricity or useful heat was generated. Hypothetically, we knew, and I don't know if maybe it's already in the record, that ARC is giving these anaerobic digesters maybe 25% of all of the different corn stillage it's throwing into its anaerobic digesters. And then a lot of that's getting flared off, but a good amount of the resulting methane is getting captured and then ultimately used for some form of energy. If it's 25% of the input is credited to ARC, why wouldn't it just be logical to say, okay, 25% of the resulting methane that gets used as energy is credited to ARC as well? Well, that might be reasonable if we had evidence to support a particular number, as you're suggesting. But also, ARC never asked for that. They never asked the court to, made an alternative argument that they're entitled to some lesser amount of the credit. Their position is that all 40 million gallons were entitled to a 50 cent per gallon credit, and so that they were entitled to all 20 million based on all 40 million gallons being sold for use as fuel. And so the substantiation issue, our position is they can't support that. But even more broadly, we've also argued that using their substances in anaerobic digesters is just, as a matter of law, is not a useless fuel. Well, the IRS has said all they need, all the taxpayer needs is a reasonable belief that it's going to be used as a fuel. Yes, that's right, that's in the IRS guidance. So how does that guidance then translate to saying that they had to have a reasonable belief that the amount of fuel created was going to correspond in any meaningful way to the amount transferred? Well, so on the question of substantiation, it's still an issue of what was the basis for saying that they reasonably believed that it was going to be, that all 40 million gallons were going to be used as fuel. And the evidence shows that they didn't have any basis for that. In fact, even of all of the biogas that... Well, they sold everything, or rather, they transferred everything to the co-digesters. Why shouldn't that be enough? They're in the business of doing that, of making methane fuel. Yeah, well, yes, that was their business. But the... But apparently it's the government, it's you, that requires companies like ACR to prove that all of the material transferred was used ultimately to create energy. Well, no, I think even if you take the reasonable belief standard, they have to prove that they had a reasonable belief that the amount for which they claimed credits, which was all 40 million, that they had a reasonable belief that that amount would be used as fuel. And there's no basis in the record for them to say that. Even if you count all of the substances from different suppliers that the WRA brought in, basically about half of it was ultimately used to generate electricity, or about half of the biogas they got from those was used to generate electricity. But even if they could substantiate that they had that reasonable belief in terms of the numbers, there's still that question of law of whether using these substances in an anaerobic digester is actually a use as fuel. And it isn't for a number of reasons, but the most significant is that... is that it didn't use the taxable fuel that made it a mixture. So an alternative fuel mixture consists of alternative fuel mixed with taxable fuel, which in this case was diesel. And when Congress created that credit, it simultaneously created a credit, same 50 cents per gallon, for using alternative fuel that's not mixed. In doing it that well, but the alternative fuel credit, however, is limited strictly to uses for vehicles. So if you're using alternative fuel by itself, then you can claim a credit only if it's being used as a vehicle fuel for like a car or a boat or an airplane. And is that in the statute? That is in the statute, yes. It's subsection D, it's in the statute. So if you're using just plain alternative fuel, ACR knew that the government would pay them nothing to use 40 million gallons of these corn stillage and so forth in an anaerobic digester because that isn't a vehicle use. And so one of their principals admitted that the only reason they added this tiny percentage of diesel fuel was to generate tax credits. And he said, quote, it has a splash of diesel fuel in it, so we can generate tax credits. So they added the diesel fuel to get out of that alternative fuel credit regime and get into the alternative fuel mixture regime. But Congress would not have set up the statute that way where a mixture can claim the credit for any use as fuel, but pure alternative fuel only gets a credit, only qualifies if it's used as vehicle fuel. They wouldn't have set up that regime unless they intended that the whole mixture would be used as fuel, the taxable fuel and the alternative fuel that are in the mixture. And in this case, it is undisputed that the diesel fuel in their mixtures did nothing in the anaerobic digestion process. You put their mixtures with diesel fuel in there and you get out some biogas and digestate and you get out the diesel fuel. It passes through unaltered. It contributes nothing to the production of energy. It was totally superfluous. And so what really then, as applied by ACR, what the incentive is, was for them to waste 40,000 gallons of diesel fuel. Because that's the only difference between they couldn't have gotten the credit without the diesel fuel and they added the diesel fuel, but it was totally superfluous. And so for that reason... But the statute doesn't say that you have to use taxable fuel in the alternative energy, right? Oh, it does. So to qualify for the... Where does it say that in the statute? It's in subsection E. An alternative fuel mixture consists of alternative fuel mixed with taxable fuel. And so... And I appreciate sort of your confusion because why Congress set it up that way is not clear. But they very definitely did set it up that way. And so to be able to claim a credit for a use of alternative fuel that's not in a vehicle, it has to be mixed with alternative fuel. It has to be mixed with taxable fuel. There's a difference between mixing it with taxable fuel and burning off taxable fuel, right? Are you referring to the biogas being burned off? Yeah. Well, biogas isn't taxable fuel. Taxable fuel is diesel or gasoline. So you have to... To claim the alternative fuel mixture credit, you have to mix your alternative fuel, whether in this case it's biomass or whether it's... There were other kinds, like certain types of natural gas and so forth. But you have to mix the alternative fuel with taxable fuel. The example in the legislative history... You're out of time. Oh, I'm sorry. Thank you. You have two minutes for a rebuttal. Thank you, Your Honor. The one thing I want to mention is this is a volumetric credit. It's based on the number of gallons of alternative fuels that are then mixed and sold. The government's net energy requirement would require that we calculate the output, and that's not what's required by the code. It's a volumetric credit based on the alternative fuels. If the Congress had wanted to make it a net production of energy measure, they would have done so. Under 64... Well, what the government's argument here is that even if you had a reasonable belief that some of this might be used in the production of fuel, did you really have a reasonable belief that the entirety of what you transferred would ever be used for that purpose? And that's not required. If you read the code section 6426E2A, the credit is calculated on the gallons of alternative fuel. So you're saying if you had a reasonable belief that five gallons would be used, you could transfer 400 gallons and take a tax credit for all of that? Yes, Your Honor. Okay. Because the statute specifically says it's based on gallons of alternative fuel sold. It's 50 cents times a gallon. If the Congress had wanted to make it on energy output, then they know how to do that. Even in section 6426 for the alternative fuels provision for fuels that are used in automobiles, they measure the credit by the BTU content. It's in the statute, in the same exact statute, 6426. They know how to measure a credit by energy output, and they didn't choose to measure the credit here by energy output. So, Your Honor, all we have to know is have a reason to believe that the fuels are being used to produce energy.  were consumed in the production of energy, and we believe the record shows that. Okay. Your Honor, thank you. Thank you, Your Honor.